No. 24-4111

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

DAVONTE J. COE,
*Defendant/Appellant.*

————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Roderick C. Young)

————————

BRIEF OF THE APPELLANT
————————

GEREMY C. KAMENS
Federal Public Defender

Frances H. Pratt
Joseph S. Camden
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Fran_Pratt@fd.org
Joseph_Camden@fd.org

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... iii

Statement of Jurisdiction................................................................................1

Statement of the Issues...................................................................................2

Statement of the Case.....................................................................................2

      A.      After being arrested and searched upon being pulled from his car at gunpoint and tased, Mr. Coe is charged federally and moves to suppress the evidence obtained from his unlawful seizure and search. ...................................................................................................3

      B.      Mr. Coe also moves to dismiss the indictment as violative of his rights under the Second Amendment. ...................................................8

      C.      Following the denial of his two pretrial motions, Mr. Coe enters a conditional guilty plea, is sentenced, and appeals.............................8

Summary of Argument....................................................................................9

Argument.......................................................................................................11

I.      The District Court Erred by Refusing to Suppress the Firearm ...................11

      A.      Standard of review................................................................................12

      B.      Argument...............................................................................................12

            1.      Officer Walker's conduct violated the Fourth Amendment because he used excessive force when seizing Mr. Coe...........12

            2.      The district court erred in concluding that the officer's use of excessive was not the but-for cause of the discovery of the firearm. ...............................................................................15

                  a.      There was a direct causal nexus. ....................................16

                  b.      There is no evidentiary basis for a finding of inevitable discovery. ......................................................18

i

3. This Court should order that the evidence be suppressed because suppression is necessary to deter future misconduct by law enforcement. ..............................21

II. Mr. Coe's Conviction Under 18 U.S.C. § 922(g)(1) Violates the Second Amendment ....................................................................23

 A. Standard of review ..............................................................23

 B. Argument ............................................................................23

  1. The *Heller-Bruen-Rahimi* framework. ....................24

  2. The Second Amendment's "plain text" applies to Mr. Coe. ...................................................................28

   a. "The people" is a broad term. ..........................28

   b. "The people" are more than just electors. ......29

   c. The political community of the United States includes more than just voters. ......................30

  3. Section 922(g)(1) fails *Bruen*'s historical test. ........35

   a. The societal problem addressed by § 922(g)(1) has existed since the founding. ............................36

   b. *Rahimi* confirms this historical analysis. ........42

  4. *Rahimi* abrogates this Court's decision in *Canada* ..................44

  5. Section 922(g)(1) is unconstitutional as applied to Mr. Coe. ...................................................................48

Conclusion ....................................................................................52

Request for Oral Argument ...........................................................53

Certificate of Compliance

## TABLE OF AUTHORITIES

Cases

*Baird v. Renbarger*, 215 F.3d 758 (7th Cir. 2000) ...................................14

*Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995).......................................15

*Brown v. Commonwealth*, 497 S.E.2d 527 (Va. Ct. App. 1998) ............................21

*Binderup v. Att'y General*, 836 F.3d 336 (3d Cir. 2016)........................................40

*Descamps v. United States*, 570 U.S. 254 (2013) .............................................. 49-50

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... *passim* 24 *et seq.*

*Folajtar v. Att'y General*, 980 F.3d 897 (3d Cir. 2020) ........................................40

*Gnad v. Commonwealth*, 497 S.E.2d 887 (Va. Ct. App. 1998)..............................21

*Graham v. Connor*, 490 U.S. 386 (1989) ...........................................................12, 13

*Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc) .....................................12

*Herring v. United States*, 555 U.S. 135 (2009)......................................................21

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) ........................................15

*Hudson v. Michigan*, 547 U.S. 586 (2006) .............................................................20

*Jackson v. United States*, No. 23-6170, ___ S. Ct. ___, 2024 WL 3259675
    (July 2, 2024) .......................................................................................................27

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)..............................................40, 41, 44

*Kentucky v. King*, 563 U.S. 452 (2011) ..................................................................22

*Knibbs v. Momphard*, 30 F.4th 200 (4th Cir. 2022) ................................................13

*Mathis v. United States*, 579 U.S. 500 (2016) ........................................................50

*McCracken v. Commonwealth*, 572 S.E.2d 493 (Va. Ct. App. 2002) .....................21

iii

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ...............................................44

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) .....................................25

*Nazario v. Gutierrez*, 103 F.4th 213 (4th Cir. 2024) ...............................................17

*N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022)
........................................................................... 8, 9, *passim* 24 *et seq.*

*Nix v. Williams*, 467 U.S. 431 (1984) ......................................................................18

*Palmer v. Commonwealth*, 143 Va. 592 (1925) ......................................................21

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *vacated and remanded*, ___ S. Ct. ___, 2024 WL 3259661 (July 2, 2024)...............31, 34, 51

*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc)....................15

*Segura v. United States*, 468 U.S. 796 (1984) ...................................................16, 20

*Tennessee v. Garner*, 471 U.S. 1 (1985)..................................................................13

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011)..............................................40

*United States v. Bullette*, 854 F.3d 261 (4th Cir. 2017)....................................16, 18

*United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) ............................ 27, 44-48

*United States v. Coleman*, 698 F. Supp. 3d 851 (E.D. Va. 2023) ...........................35

*United States v. Doss*, No. 22-3662, 2023 WL 8299064 (8th Cir. 2023), *vacated and remanded* ___ S. Ct. ___, 2024 WL 3259684 (July 2, 2024)
.................................................................................................................45

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), *vacated by grant of rehearing en banc*, 2024 WL 3443151 (July 17, 2024) ........................ 28, 34-35

*United States v. Edwards*, 666 F.3d 877 (4th Cir. 2011)...........................14, 21, 22

*United States v. Ferebee*, 957 F.3d 406 (4th Cir. 2020)..........................................18

*United States v. Hill*, ___ F. Supp. 3d ____, 2023 WL 8238164 (E.D. Va. Nov. 28, 2023), *appeal pending in* Fourth Cir. No. 24-4194 ............................29

*United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. 2023), *appeal pending in* Fourth Cir. No. 24-4083 ........................................................................8, 24, 29

*United States v. Lewis*, 606 F.3d 193 (4th Cir. 2010).............................................12

*United States v. Miller*, 307 U.S. 174 (1939) ...........................................................24

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) .......................................28, 47

*United States v. Neugin*, 958 F.3d 924 (10th Cir. 2020) .........................................19

*United States v. Rahimi*, 144 S. Ct. 1889 (June 21, 2024)... 11, 24, *passim* 26 *et seq.*

*United States v. Ranaldson*, 369 F. App'x 419 (4th Cir. 2010)...............................14

*United States v. Riley*, 635 F. Supp. 3d 411 (E.D. Va. 2023).................................29

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) ............................40

*United States v. Smoot*, 690 F.3d 215 (4th Cir. 2012) ............................................23

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ..........................28, 29, 32

*United States v. Wilson*, 951 F.2d 586 (4th Cir. 1991) ...........................................49

*Vincent v. Garland*, No. 23-683, ___ S. Ct. ___, 2024 WL 3259668 (July 2, 2024) ......................................................................................................................27

*Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213 (4th Cir. 2018)............13

Constitutional Provisions, Statutes, and Rules

U.S. Const. Art. I, § 2 ..............................................................................................30

U.S. Const. amend. II (Second Amendment) .....................................................*passim*

U.S. Const. amend. IV (Fourth Amendment).......................................... 7, 9, 12-22

18 U.S.C. § 922 ....................................................................................................*passim*

18 U.S.C. § 3231 ..................................................................................1

28 U.S.C. § 1291 ..................................................................................1

Fed. R. App. P. 4 ..................................................................................1

<u>Other Authorities</u>

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245 (2021) ......................................................................39

Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771), *available at* https://tinyurl.com/uk4b4fxd ..........................................29

Samuel Johnson, *A Dictionary of the English Language* (1766), *available at* https://tinyurl.com/y95erjwf ..............................................29

Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371 (2009)..........................................................................41

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695 (2009) ........................................................40

*United States v. Rahimi*, U.S. No. 22-915, Brief for United States ........................33

No. 24-4111

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

———————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

DAVONTE J. COE,
*Defendant/Appellant*.

———————

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Roderick C. Young)

———————

BRIEF OF THE APPELLANT

———————

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C. § 3231. That court entered the order of judgment and conviction on February 8, 2024. J.A. 205. Mr. Coe filed his notice of appeal on February 21, 2024. J.A. 212; *see* Fed. R. App. P. 4(b)(1), (b)(6). Therefore, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

1

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether the district court erred in denying Mr. Coe's motion to suppress evidence gathered as the result of a seizure resulting from the use by the police of excessive force.

II.      Whether Mr. Coe's conviction must be vacated because 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment, whether facially or as applied to Mr. Coe.

## <u>STATEMENT OF THE CASE</u>

After being seized at gunpoint, pulled from his car, and then tased one night in early March 2023, Davonte Coe was charged in federal court ten weeks later with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  Mr. Coe filed two pretrial motions: one to dismiss the evidence against him based on his unlawful seizure, and the other to dismiss the indictment as violative of his Second Amendment right to possess firearms.  After the district court denied both motions, Mr. Coe entered a conditional plea of guilty, preserving his rights to appeal the denial of both of his motions.  The district court sentenced Mr. Coe to 30 months' imprisonment.  Mr. Coe now appeals.

A.    <u>After being arrested and searched upon being pulled from his car at gunpoint and tased, Mr. Coe is charged federally and moves to suppress the evidence obtained from his unlawful seizure and search</u>.

Mr. Coe was charged in federal court in May 2023 with possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  He filed two motions before trial seeking to terminate the prosecution.  One of the motions sought to suppress the evidence obtained from what he contended was his unlawful seizure and arrest as the result of law enforcement's use of excessive force.  J.A. 28-37 (motion); J.A. 73-87 (government's opposition to suppression motion).  At a hearing conducted at the end of July 2023, the evidence showed the following:

1.    One evening in March of 2023, Officer Dquan Walker, who had just a year of experience as a member of the Richmond Police Department after going through the department's training academy, was on patrol and stopped at the store to conduct a merchant check.  J.A. 92; J.A. 93; J.A. 139.  After parking his patrol car on the left side of the 701 Express, Office Walker walked around to the store's entrance.  J.A. 93-94; J.A. 139.  As he did so, he observed a car parked near the entrance, and Mr. Coe sitting inside it in the driver's seat with someone in the front passenger seat.  J.A. 95; J.A. 139.

Seeing what he believed to be several clear small bags of cocaine in Mr. Coe's hand, Officer Walker pulled out his flashlight and placed it right up against the driver's side window to shine it into the car.  J.A. 94; J.A 109; J.A. 139-140.  Outside

3

floodlights mounted on the storefront were behind him, J.A. 108-110, sending strong bright light into the car in addition to the light from the flashlight, *see* J.A. 123.

Officer Walker also pulled his firearm before opening the door to Mr. Coe's car.  J.A. 140 (court's factual finding); J.A. 145 (same).  The gun, a Glock 9-mm handgun without a safety, was fully loaded and chambered.  J.A. 118-119.  The officer's index finger was on the trigger.  J.A. 113-114.



The officer claimed that he kept his finger on the trigger rather than along the barrel of the gun because "[y]ou never know when you're going to have to shoot somebody."  J.A. 114.  He further explained that he drew his gun because "[w]henever there's any type of crime that's committed, regardless of what type of crime it is, if you're going to encounter a person or you expect physical—any type of physical, especially for use of force I'm going to be doing, obviously best to go with the firearm first because you never know what that person has."  J.A. 119-120.

Officer Walker then opened the driver's side door to grab Mr. Coe; as he did so, the officer asserted, Mr. Coe tried to conceal what he was holding. J.A. 95. Upon Officer Walker's command, and with the officer's left hand holding on to control him while the officer held his firearm in his right hand, Mr. Coe began to get out of the car. J.A. 95; J.A. 139; *see* J.A. 145. Although he had no strong indication that Mr. Coe would try to flee at that point, the officer immediately used his left forearm to pin Mr. Coe by his neck against the door frame of the car. *See* J.A. 122-123; J.A. 140; J.A. 145. Gov't Exh. 2, camera 1, at 10:27:06.

Once outside his car, Mr. Coe twisted and turned in a continuing effort to conceal the baggies of white powder he held in his hands down low. J.A. 96; J.A. 110. At that point, Officer Walker holstered his gun, pulled out his taser, and turned it on. J.A. 96; J.A. 104. Mr. Coe then threw what he had in his hand up in the air, and what landed on the ground in front of the car was quickly scooped up by people standing nearby. J.A. 96-97. Officer Walker immediately threatened to tase them to prevent them from taking what had fallen. J.A. 97; J.A. 107-108.

As Mr. Coe continued to struggle against being forcefully pinned to his car, pushing somewhat against Officer Walker, the officer threatened to tase him as well. J.A. 97. Mr. Coe eventually twisted out of Officer Walker's grasp, knocking off his body-worn camera in the process. J.A. 101. It wasn't until then that Officer Walker first observed the firearm in Mr. Coe's back waistband on the right side. J.A. 101

("Once my body cam was knocked off, that's when I seen the firearm on the back of him, because he exposed his back to me."); Gov't Exh. 1, at 21:18:49 (body camera knocked off and falls to the ground); J.A. 116 (officer agreement with defense counsel that he did not see gun until Mr. Coe "was fully out of the car and you two were struggling along the side of the car and ... his back was shown to you that you saw the firearm").

When Mr. Coe turned back around, Officer Walker tased Mr. Coe for five seconds, causing him to fall to the ground. J.A. 98; J.A. 116-117. As Mr. Coe lay on the ground, twitching with his legs extended, the officer tased him again at a higher level than before. J.A. 98-99; J.A. 101; J.A. 117-118; Gov't Exh. 2, camera 2, at 10:27:32–50.

2.     At the end of the suppression hearing, the district court found that Mr. Coe's suppression motion "should be overruled because excessive force is not a basis to suppress evidence unless there's a sufficient causal nexus between the force used and the evidence discovered. The Court finds that there's no such nexus under the facts of the instant case, and so for that reason, the motion to suppress is overruled." J.A. 136.

In a written opinion issued two days after the suppression hearing, the district court elaborated on its conclusion. After laying out its findings about what transpired in the encounter between Mr. Coe and Officer Walker and the procedural

history of the case, J.A. 139-141, the court turned to its analysis of the arguments made by the parties, J.A. 141-147. The court began by acknowledging that the use of excessive force by law enforcement can result in the violation under the Fourth Amendment of a person's right to be free from unreasonable seizures of their person. J.A. 143-144.

Having recognized that principle, however, the court set it aside to address whether, assuming the force used by Officer Walker was constitutionally unreasonable, there existed a causal connection between that use of force and the discovery of the firearm. J.A. 144-146. The court concluded that no such connection existed because Officer Walker would have discovered the firearm regardless of his use of force. J.A. 145 ("Nothing about the force used by Officer Walker *caused* the firearm to be discovered. That is, regardless of how Officer Walker carried out this concededly permissible stop, he would have discovered the firearm, whether during the course of a *Terry* frisk or a standard search incident to arrest."); J.A. 146 (in comparing facts of Mr. Coe's case to those in another case, concluding that "even if one accepts that the seizure in question was unreasonable, the evidence obtained was merely the product of the *Terry* stop, not the *manner* in which it was carried out").

Additionally, the court concluded that "[t]he discovery of the weapon was not derived from nor related to the allegedly excessive use of force, and as such,

suppression of the weapon would not deter any such conduct." J.A. 146.  But even

if it had been, the court posited, Mr. Coe could pursue civil remedies.  J.A. 146-147.

In keeping with its conclusions, the court denied Mr. Coe's motion to suppress the

firearm.  J.A. 147; *see* J.A. 148 (order).

B.    <u>Mr. Coe also moves to dismiss the indictment as violative of his
      rights under the Second Amendment.</u>

In a separate motion, Mr. Coe argued that the indictment violated his Second

Amendment right to keep and bear arms.  J.A. 10.  Citing the Supreme Court's

decision in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), he

argued that criminalizing the mere possession of a firearm, even by a person with a

felony conviction, was inconsistent with this Nation's historical tradition of firearm

regulation.  J.A. 12-27.  The district court denied the motion, adopting its opinion in

a previous case, *United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. 2023), *appeal*

*pending in* Fourth Cir. No. 24-4083.  J.A. 154; J.A. 156-157; *see* J.A. 158 (order).

C.    <u>Following the denial of his two pretrial motions, Mr. Coe enters
      a conditional guilty plea, is sentenced, and appeals.</u>

The district court denied Mr. Coe's motion to suppress on September 13,

2023, and his motion to dismiss on September 26, 2023.  J.A. 139; J.A. 148;

J.A. 154; J.A. 158.  One week later, on October 4, 2023, Mr. Coe entered a

conditional plea pursuant to a plea agreement, which the district court accepted.

J.A. 159; J.A. 173-174; J.A. 185-186; J.A. 191-192 (provision in plea agreement

that "[t]he defendant agrees that he is pleading guilty conditionally to the Indictment pursuant to Fed. R. Crim. Pro. l l(a)(2). The defendant knowingly waives the right to appeal his conviction on any ground whatsoever other than the motion to dismiss the Indictment that he filed based on *New York State Rifle & Pistol Association, Inc, et al. v. Bruen,* 142 S. Ct. 2111 (2022), (Order ECF No. 36) or the motion to suppress that he filed (Order ECF No. 33) ….").

The district court sentenced Mr. Coe on February 8, 2024, to 30 months in prison, to be followed by three years of supervised release. J.A. 205-207. Mr. Coe noted this appeal on February 21, 2024. J.A. 212.

## SUMMARY OF ARGUMENT

I.     The district court should have suppressed the firearm seized in this case, because the police officer's use of deadly force was excessive and unjustified in violation of the Fourth Amendment. Putting his gun to Mr. Coe's head and back, finger on the trigger, round in the chamber, and pinning him to the car by his neck were a disproportionate and unreasonable response to seeing Mr. Coe with baggies of white powder in his lap. Suppression was the proper remedy because the officer's threat of deadly force was a "but for" cause of the discovery of the gun, and the government failed to provide any evidentiary support for its argument of inevitable discovery. The district court erred first in conflating the "causal nexus" requirement

9

with inevitable discovery, and second in not allocating the burden to the government to prove an evidentiary basis for the inevitable discovery doctrine to apply.

II.    Criminalizing firearm possession pursuant to 18 U.S.C. § 922(g)(1) is unconstitutional under *Bruen*'s "text and history" standard.  *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation."  597 U.S. at 17.

First, the Second Amendment's "plain text" entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests that individuals with prior felony convictions are not within "the people."  Mr. Coe, and others similarly situated, are part of "the people" who have the right to keep and bear arms.

Second, under *Bruen*'s "text and history" standard, the government is unable to rebut the presumption that § 922(g)(1) is unconstitutional.  The United States' "historical tradition of firearm regulation" shows that felon-disarmament laws did not appear until the 20th century—well after the period *Bruen* deems relevant. And the government cannot discharge its burden by likening § 922(g)(1) to laws that disarmed supposedly "dangerous" or "unvirtuous" groups.  Those categories are far

10

too broad under a proper *Bruen* analysis, as recently confirmed by the Supreme Court in *Rahimi*, 144 S. Ct. 1889 (2024). *Bruen* and *Rahimi* require that if a regulation such as § 922(g)(1) burdens a United States citizen's constitutional right to arm themselves in self-defense, the government must prove a history and tradition of regulating conduct that is distinctly similar to the modern regulation. The government cannot satisfy this burden because it can point to no historical regulation or statute that is distinctly similar to § 922(g)(1). For those reasons, the district court erred in denying Mr. Coe's motion to dismiss the indictment under the Second Amendment.

## **ARGUMENT**

I.   THE DISTRICT COURT ERRED BY REFUSING TO SUPPRESS THE FIREARM

The district court here refused to suppress the firearm Officer Walker recovered after tasing Mr. Coe, because it held that there was no causal nexus between the use of excessive force and the seizure of the firearm. This was wrong for two reasons. First, the district court conflated the causal nexus requirement—that the constitutional violation *actually did* result in the seizure of evidence—with the inevitable discovery doctrine, which asks whether the evidence *would have been* discovered absent the violation. This first error led to the second error, which was a failure to put the burden where it belonged, on the government to prove inevitable discovery. Here, the evidence presented by the government did not provide any

factual basis for a finding of inevitable discovery, leaving the district court to rely only on speculation. Under the proper legal standard, suppression was the only available remedy.

      A.    <u>Standard of review</u>

A claim that excessive force was used by the police against a citizen is analyzed under the Fourth Amendment's prohibition of unreasonable seizures of the person. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). When considering the denial of a motion to suppress on appeal, therefore, this Court reviews the district court's factual findings for clear error and legal conclusions de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010).

      B.    <u>Argument</u>

          1.    <u>Officer Walker's conduct violated the Fourth Amendment because he used excessive force when seizing Mr. Coe</u>.

The Fourth Amendment protects the right of the people to be "secure against unreasonable searches and seizures." U.S. Const. Amend. IV (elipses omitted). In the typical criminal case, a defendant challenges a search of a house or car, or an arrest or traffic stop; and the argument that the search or seizure is unreasonable depends on the level of suspicion officers had. In this case, however, Mr. Coe challenged not the level of suspicion, but rather the level of force. The Fourth Amendment covers claims of excessive force as well as insufficient suspicion. *See Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc) (citations omitted).

All Fourth Amendment reasonableness inquiries consider the totality of the circumstances, but for excessive force claims, the courts focus on three factors to determine whether the level of force used was objectively unreasonable:

> "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." An officer may not use deadly force against a person who "poses no immediate threat to the officer and no threat to others."

*Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018) (citations omitted) (quoting *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

These factors all point to the seizure of Mr. Coe and the resulting discovery and seizure of the firearm as constitutionally infirm. As to the first factor, the crime at issue was drugs or counterfeit drugs: Officer Walker walked past Mr. Coe's car and saw him in the driver's seat with a baggie with white powder. Nothing in Mr. Coe's conduct at the point the officer saw him was violent.

Turning to the second factor, Mr. Coe posed no immediate threat to the safety of the officer. Indeed, due to the bright lights backlighting the police officer and the officer's flashlight pressed against the window of the car, Mr. Coe barely realized the officer was at the car door before a gun was at his back with a finger on the trigger. *See Knibbs v. Momphard*, 30 F.4th 200, 217 (4th Cir. 2022) (denying summary judgment on qualified immunity for nighttime shooting by police where

"the record does not conclusively establish that Knibbs could have visually identified Deputy Momphard as a law enforcement officer on his porch that night.").

As to the third and final factor, at the time Officer Walker pulled out his firearm and came close to killing Mr. Coe, the latter was offering no resistance and making no attempt to flee.  Rather, Mr. Coe was standing still with the officer's elbow pinning him to the car door frame by the neck and holding up both hands. Gov't Exh. 2, camera 1, at 10:27:05 (showing left hand raised with small baggie); Gov't Exh 1, at 21:18:27 (showing right hand raised with cell phone); J.A. 111 (officer acknowledging that Mr. Coe's left hand raised holding cell phone as officer points gun at his back).

Other circuits with richer caselaw than the Fourth Circuit on this type of claim have held that uses of force quite similar to the force in this case were unreasonable.[1] For example, in *Baird v. Renbarger*, 215 F.3d 758, 774 (7th Cir. 2000), an officer

---

[1] This Court has not expressly decided whether a claim of excessive force in violation of the Fourth Amendment can justify suppression.  It entertained a suppression claim based on excessive force in *United States v. Ranaldson*, 369 F. App'x 419 (4th Cir. 2010) (unpublished) but resolved it on the ground that the use of force was not excessive.  The balance of cases arise under 42 U.S.C. § 1983.  This Court has granted suppression for a Fourth Amendment violation that was not tied to the level of suspicion in *United States v. Edwards*, 666 F.3d 877, 955 (4th Cir. 2011), in which, police officers arrested a suspect on an active warrant.  While waiting for transportation, they pulled the defendant's waistband out, looked in his boxers, and found drugs in a baggie tied around his penis.  They cut the drugs off with a knife.  All of this happened on a public street.  The Court held the search unreasonable and ordered suppression of the drugs.

14

pointed a loaded weapon at a citizen while executing a search on the wrong address. He sued and the officer was denied qualified immunity. *Id*. (holding it was clearly "established that holding [a] gun to a person's head and threatening to pull the trigger is a use of deadly force"). Other circuits are in accord. *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002) (en banc) (pointing a gun at an unarmed suspect who poses no danger constitutes excessive force); *Baker v. Monroe Township*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (detention at gunpoint violated the Fourth Amendment as there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used"); *see also Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001) (holding children at gunpoint after the officers had gained complete control of the situation "was not justified under the circumstances").

Thus, although the district court sidestepped the question of Officer Walker's excessive use of force, *see* J.A. 142, this Court should make clear that on the facts of Mr. Coe's case, the degree of force was in fact excessive.

2.    The district court erred in concluding that the officer's use of excessive was not the but-for cause of the discovery of the firearm.

The district court erred when it found no causal nexus between the officer's use of excessive force and the seizure of the firearm. It held that "regardless of how Officer Walker carried out this concededly permissible stop, he would have

15

discovered the firearm, whether during the course of a *Terry* frisk or a standard search incident to arrest." J.A. 145. But that is not the standard, and the district court confused inevitable discovery with the causal nexus requirement.

A causal nexus, as the basement requirement for suppression under the Fourth Amendment, is a low standard. It asks whether the unreasonable search or seizure *actually did* lead to discovery of evidence. *See Segura v. United States*, 468 U.S. 796, 815 (1984) (Fourth Amendment violation must be "at least the 'but for' cause of the discovery of the evidence."). If that's so, then the government (not the defense) bears the burden of proving that discovery was inevitable under some hypothetical course of action that did not violate the Fourth Amendment. *See United States v. Bullette*, 854 F.3d 261, 267 (4th Cir. 2017).

> a.   There was a direct causal nexus.

Here, the direct causal nexus exists as a chain of events, one leading to another, and all captured on high-definition video. Officer Walker pulled his firearm and pointed it at Mr. Coe as he opened the door to the car, backlit by a large bright floodlight. The officer pinned Mr. Coe by his neck against the car door frame. As a result, Mr. Coe, who has been shot before, froze and stiffened and tried to get away. As a result of his attempt to flee, Officer Walker tased him and saw the firearm. That is a direct chain of cause and effect from use of the firearm and pinning Mr. Coe to the door to discovery of the firearm.

16

This Court has very recently noted that the unjustified use of deadly force by the police can have exactly that effect. In *Nazario v. Gutierrez*, 103 F.4th 213, 232 (4th Cir. 2024), this Court held that the Fourth Amendment protects against "unwarranted threat[s] of deadly force." It presciently described the evils that come from hair-trigger gun brandishing by the police: "[T]o point a firearm at a person is a threat with deadly force, and is therefore likely to instill fear, which could manifest into panic and a rash reaction." It can "needlessly escalate the stop, making it more dangerous for everyone involved." *Id*.

Here, Mr. Coe—a young black man who had been shot previously, accosted unexpectedly by a man, backlit with floodlights, with a gun who dragged him from his car—had the only natural reaction for someone in that situation: to freeze and then try to get away. It was directly in the course of this attempt to flee and his tasing that the firearm was discovered (since Mr. Coe did not attempt to use it). This logical chain of events, one leading to another, establishes a causal nexus—the use of the gun, dragging Mr. Coe from the car and pinning Mr. Coe against the door by his neck *did actually* lead to discovery of the firearm. Nothing more is required for a causal nexus.

Instead, if the government wants to oppose suppression, it (not Mr. Coe) bears the burden of proving that discovery was inevitable absent the Fourth Amendment

violation. It argued inevitable discovery below, J.A. 85-86, but as discussed below, did not establish an evidentiary basis for the doctrine to apply.

>b. <u>There is no evidentiary basis for a finding of inevitable discovery.</u>

In contrast to the bare chain-of-causation requirement for a causal nexus, inevitable discovery asks whether, positing a hypothetical where the officer did *not* violate the Fourth Amendment, discovery of the evidence would have resulted. But the inevitable discovery rule does not allow speculation. *See Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) ("[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings."). "The government meets its burden and this Court can affirm on inevitable-discovery grounds if the district court can assess the inevitability and reasonableness of a hypothetical inventory search from testimony provided by a law-enforcement official." *United States v. Bullette*, 854 F.3d 261, 267 (4th Cir. 2017); *see also United States v. Ferebee*, 957 F.3d 406, 417 n.2 (4th Cir. 2020) (when government "offered no evidence about the inventory search procedures of the law enforcement agencies involved in this case, the district court erred by relying on the inevitable-discovery doctrine."); *id*. at 425 n.6 (Floyd, J., dissenting) ("When a federal court takes it upon itself to make a legal argument that the prosecution has not made, based on evidence that the prosecution has not

18

produced, the legitimacy of our criminal-justice system is degraded. The court has a duty to ensure that the government is held to its burden of proof in every criminal case. Here, the district court turned that duty on its head.")

But instead of exploring this counterfactual hypothetical in its presentation of evidence, the government merely doubled down on Officer Walker's "you never know when you might have to shoot someone" justification. *See* J.A. 119-120.

In particular, Officer Walker did not testify at all as to what he would have done had he not pulled his gun on Mr. Coe, pinned him against the car, and then tased him. In fact, to the contrary, he insisted that he uses his gun no matter what the crime under investigation, just in case. J.A. 119-120 ("Whenever there's any type of crime that's committed, regardless of the type of crime it is, if you're going to encounter a person or you expect physical—any type of physical, especially for use of force I'm going to be doing, obviously *best go with the firearm first because you never know what that person has*.") (emphasis added). Thus, the district court's conclusions that the firearm would have been discovered during a *Terry* frisk or search incident to arrest were speculation. Officer Walker did not testify he would have conducted a *Terry* frisk (which is a decision the officer, not the Court, makes). In other words, although the government argued inevitable discovery, it failed to establish any evidentiary basis for what *would have happened* and relied instead on speculation. *United States v. Neugin*, 958 F.3d 924, 935 (10th Cir. 2020) ("The

inevitable discovery exception to the exclusionary rule cannot be invoked because of a highly speculative assumption of 'inevitability.'") (citations, brackets omitted).

It is that lack of an actual alternative source that distinguishes this case from *Segura v. United States*, 468 U.S. 796 (1984). In *Segura*, it was the existence, in the record, of an independent warrant, based on information not obtained through any Fourth Amendment violations, "under which that evidence was seized;" the Court held that exclusion was not warranted "because of that independent source." *Id*. at 814. Likewise, in *Hudson v. Michigan*, 547 U.S. 586 (2006), cited by the government below, J.A 76, the Fourth Amendment violation (failure to knock and announce) just didn't even enter into the causal chain. *See id*. at 592 ("In this case, of course, the constitutional violation of an illegal manner of entry was not a but-for cause of obtaining the evidence."); *id*. at 604 (Kennedy, J., concurring) ("In this case the relevant evidence was discovered not because of a failure to knock and announce, but because of a subsequent search pursuant to a lawful warrant."). Here, in contrast, the government did not attempt to produce, and the district court did not point to, any evidentiary basis for an independent intervening source for discovery of the firearm. *See also* J.A. 135 (defense counsel noting during argument that Officer Walker's handling of the situation without his gun was "completely hypothetical.").

And it's not even at all clear that, once Officer Walker pulled out his gun, Mr. Coe would inevitably have been arrested at all. Mr. Coe conceded that the officer

had sufficient suspicion, based on the baggies in his lap, to initiate an encounter with Mr. Coe; but even a "lawful arrest, when made with unlawful force, may be resisted" in Virginia. *McCracken v. Commonwealth*, 572 S.E.2d 493, 497 (Va. Ct. App. 2002) (citing *Palmer v. Commonwealth*, 143 Va. 592, 602-03 (1925)). This includes excessive force. *Id*. (quoting *Gnad v. Commonwealth*, 497 S.E.2d 887, 888 (Va. Ct. App. 1998)). The amount of force used resisting an officer's unreasonable use of force "must be reasonable in relation to the harm threatened." *See Brown v. Commonwealth*, 497 S.E.2d 527, 530 (Va. Ct. App. 1998). But here, Mr. Coe did not use or attempt to use the firearm, did not punch or attack Officer Walker; he only stiffened his body and tried to get away. In response to Officer Walker's first deadly aggression, his limited resistance of attempting to flee was justified.

3. <u>This Court should order that the evidence be suppressed because suppression is necessary to deter future misconduct by law enforcement</u>.

Finally, the Court should conclude that deterrence by suppression is furthered in this case for several reasons. "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *United States v. Edwards*, 666 F.3d 877, 886 (4th Cir. 2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). Here, Officer Walker's conduct was violent and apparently deliberate, but at a minimum reckless in creating an unnecessary risk, when he put his gun to Mr. Coe's back and neck

with his finger on the trigger while Mr. Coe had both hands raised. *See Edwards*, 666 F.3d at 887 (noting "the real possibility that a suspect may suffer injuries when a knife is employed"). Second, Officer Walker was "not operating under any exigency"—at least not that he didn't create by first dragging Mr. Coe from the car at gunpoint, with his finger on the trigger. *Id*. at 887; *Kentucky v. King*, 563 U.S. 452, 469 (2011) (recognizing police-created exigency doctrine, which applies when police gain access "by means of an actual or threatened violation of the Fourth Amendment").

Deterrence is needed here for two reasons. The first is because the violation is likely to recur, as the Richmond Police Department has, after the fact, approved Officer Walker's conduct. The reviewing supervisor stated that the later use of a taser was justified, that Officer Walker's conduct was "within the policy guidelines," and that "lethal force could have been applied" to a man who had white powder in his lap and was dragged unexpectedly from his car. J.A. 37. Therefore, if the Court finds a Fourth Amendment violation, suppression is warranted because the Richmond Police Department has demonstrated that it will not change practice on its own, but instead condones this conduct.

And second, deterrence is most needed for Officer Walker himself. He put a loaded gun to Mr. Coe's back with no safety, a round in the chamber and his finger on the trigger, and his justification was that Mr. Coe had baggies of white powder in

his lap.  He believes he is justified in doing this "regardless of what type of crime it is" J.A. 119, because "[y]ou never know when you're going to have to shoot somebody."  J.A. 114.  Officer Walker is quite likely going to kill someone, and nothing in the conduct of this case so far has shown him that there are rules governing the use of deadly force by police.

## II.    MR. COE'S CONVICTION UNDER 18 U.S.C. § 922(G)(1) VIOLATES THE SECOND AMENDMENT

### A.    Standard of review

This Court "review[s] de novo a defendant's constitutional challenge to a criminal statute."  *United States v. Smoot*, 690 F.3d 215, 219 (4th Cir. 2012).

### B.    Argument

The lifetime ban on firearm possession under which Mr. Coe was convicted is unconstitutional, both facially and as applied to him, under the framework established in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), and clarified in *United States v. Rahimi*, 144 S. Ct. 1889 (June 21, 2024).  Although the Supreme Court decided *Rahimi* after the district court denied Mr. Coe's motion to dismiss, it supports his arguments.  This Court should reverse.

The parties agreed that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the burden is on the government to show that a law proscribing such conduct is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597

U.S. at 17; *see* J.A. 13 (motion); J.A. 43 (opposition). The government argued below that Mr. Coe did not come within the Second Amendment's "plain text" because "the people" is limited to "law-abiding, responsible citizens." J.A. 51-59. The *Lane* decision adopted by the district court agreed. J.A. 94 (district court order adopting *Lane*); *Lane*, 689 F. Supp. 3d 232, 243-49 (E.D. Va. 2023). *Rahimi*, however, now forecloses that argument. Under a proper application of the *Bruen* test, Mr. Coe's prosecution is unconstitutional.

1. The *Heller-Bruen-Rahimi* framework.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment "conferred an individual right" "to possess and carry weapons in case of confrontation." *Id.* at 576, 582, 592-95. Further, possessing ammunition—whether already loaded into a gun or available for reloading—is inherent in the right to bear arms. *See United States v. Miller*, 307 U.S. 174, 180-82 (1939) (describing and quoting militia laws in effect at the time Second Amendment passed requiring possession of ammunition).

In *Bruen*, the Supreme Court set forth a test for determining the constitutionality of firearm regulations. After clarifying that the courts of appeals had misunderstood *Heller* by embracing means-end scrutiny in the Second

Amendment analysis, *see Bruen*, 597 U.S. at 18-22, *Bruen* clarified the "text and history" approach of *Heller* by bifurcating "text" and "history" into separate steps of an analytical framework for deciding the constitutionality of all firearm regulations going forward. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023).

At Step One of *Bruen*'s test, courts are to consider only whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct." *Id.* And, *Bruen* clarified, regulating presumptively protected conduct is unconstitutional unless, at Step Two of the analysis, the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37.

*Bruen* not only clarified but extended *Heller*'s reasoning, by newly articulating specific burdens and rules to govern the "historical tradition" inquiry. First, *Bruen* made clear that the burden at Step Two rests entirely with the government. The government alone must "establish the relevant tradition of regulation." 597 U.S. at 58 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." *Id.* at 60. Rather, *Bruen* held, consistent with ordinary "principle[s] of party presentation,"

courts must "decide a case based on the historical record compiled by the parties." *Id.* at 25 n.6. If that record yields "uncertainties," the Court dictated, courts should rely on *Bruen*'s "default rules"—the presumption of unconstitutionality at Step One and the government's burden at Step Two—"to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

*Rahimi* confirmed this framework, and expounded on Step Two. It confirmed that the government "bears the burden to justify its regulation" when it "regulates arms-bearing conduct." 144 S. Ct. at 1897. The government then must show that "the challenged regulation is consistent with the principles that underpin our regulatory tradition"—that is, "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898.

The *Rahimi* Court made several clarifications relevant to the ongoing debates in courts below, discussed more fully *infra*. First, it did not require an exact historical match to modern regulations, allowing instead a certain level of abstraction to modern circumstances from the "principals that underpin" the historical understanding of the right. 144 S. Ct. at 1898. On the other hand, it held that the *extent* of the regulation (the "how") was governed by practice at the founding. *Id.* ("Even when a law regulates arms-bearing for a permissible reason, though, it may

not be compatible with the right if it does so to an extent beyond what was done at the founding.").

*Rahimi* upheld § 922(g)(8), which forbids possession of a firearm by a person subject to a domestic violence protective order premised on a finding of risk of violence. It found such protective orders analogous to surety laws and going-armed statutes, abstracting the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 144 S. Ct. at 1901. The protective orders at issue in *Rahimi* were premised on actual individualized, prospective findings of risk of violence against a specific person, and operate for a limited period of time while the threat exists, which, the Court held, fit within that historical principal both as to why the right was burdened and how it was burdened. *See id*.

To effectuate its holding in *Rahimi*, the Supreme Court summarily granted certiorari, vacated, and remanded cases from the Eighth and Tenth Circuits relying on that earlier language to support a presumption that the Second Amendment does not apply to felons. *See Jackson v. United States*, No. 23-6170, ___ S. Ct. ___, 2024 WL 3259675 (July 2, 2024); and *Vincent v. Garland*, No. 23-683, ___ S. Ct. ___, 2024 WL 3259668 (July 2, 2024). And notably, this Court in *United States v. Canada* expressly chose not to decide "whether *Bruen* sufficiently unsettled the law in this area to free us from our otherwise-absolute obligation to follow this Court's

27

post-*Heller* but pre-*Bruen* holdings rejecting constitutional challenges to [§ 922(g)(1)]." 103 F.4th 257, 258 (4th Cir. 2024) (citing *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012)). That question is squarely presented in this case.

2.    The Second Amendment's "plain text" applies to Mr. Coe.

a.    "The people" is a broad term.

"[T]he people" is "a term of art employed in select parts of the Constitution." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Specifically citing the First, Second, and Fourth Amendments, the Supreme Court defined "the people" not by whether they have always acted in a law-abiding manner, but as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 265. *Heller* re-affirmed this definition, specifically citing *Verdugo*. *See Heller*, 554 U.S. at 579-81; *id*. at 581 (Second Amendment right "belongs to all Americans"); *see also United States v. Duarte*, 101 F.4th 657, 671 (9th Cir. 2024), *vacated by grant of rehearing en banc*, 2024 WL 3443151 (July 17, 2024) ("Our own analysis of the Second Amendment's text and history also confirms that the original public meaning of 'the people' in the Second Amendment included, at a minimum, all American citizens.").

This understanding existed at the time of the Second Amendment's enactment. Founding era dictionaries define "people" as "those who compose a

community," and extending to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.  Mr. Coe was born in the United States and has lived here all his life.  J.A. 197.  That suffices to make him one of "the people."

This Court should reject the suggestion that people who are born in this country and have ties only to this country might not be one of "the people" due to criminal history.  Several opinions tie the phrase "the people" to the elective franchise; but they ignore the full context of the constitutional provision, narrowly construe "political community" to mean voting, and ignore Supreme Court cases like *Verdugo* that include non-voters in "the people."

> b. <u>"The people" are more than just electors.</u>

Some courts, including within this Circuit, have been persuaded that the right to keep and bear arms in self-defense is tied to the elective franchise (the right to vote).  *See, e.g.*, *United States v. Hill*, ___ F. Supp. 3d ____, 2023 WL 8238164 (E.D. Va. Nov. 28, 2023), *appeal pending in* Fourth Cir. No. 24-4194; *United States v. Riley*, 635 F. Supp. 3d 411, 424 (E.D. Va. 2023); *Lane*, 689 F. Supp. 3d 232, 246

(E.D. Va. 2023) (discussing felons' lack of political rights, presently and historically, and concluding that "[f]elons, systematically stripped of 'political rights', are simply not 'members of the political community'").

These opinions rest on faulty premises. Some note that the phrase "the People" appears in Article I, § 2, which states that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States[.]" Therefore, they conclude, "the People" must refer to those who choose representatives, meaning those with voting rights. But this logic is inconsistent with the rest of the paragraph, which expressly differentiates between "the People" and the narrower subset of "Electors":

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

Art. I, § 2, cl. 1.

The full context shows that the framers understood the difference between the People generally and those from among the People who actually chose representatives—that is, Electors.

c. <u>The political community of the United States includes more than just voters.</u>

These opinions fail to recognize that there is more to being a member of the "political community" than the elective franchise. Felons have the right to peaceably

assemble under the First Amendment, to lobby the government, and to work on campaigns, and thereby influence the political process. Felons and those who can't vote have the right to petition in court. Felons and others who can't vote have rights "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Felons and others who can't vote are still entitled to "equal protection of the laws." Only a miserly interpretation of the "political community" would read it to relate only and strictly to the right to cast a vote. This is especially so when restrictions on voting are subject (unlike individual constitutional rights) to the vagaries of state policy, and didn't always include (in 1791) women, people of color, Catholics, or other non-white non-male non-landowner, non-Protestants. Martha Washington, Abigail Adams, and Dolley Madison, for example, couldn't vote but were undoubtedly members of the political community. If "political community" means anything beyond "citizen" in *Heller* and *Bruen*, it means those members of the coherent group of people who participate in the life of this Nation. Thus, adopting a "law-abiding, responsible citizens" limitation "devolves authority to legislators to decide whom to exclude from 'the people.'" *Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc), *vacated and remanded*, ___ S. Ct. ___, 2024 WL 3259661 (July 2, 2024). That approach—which "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label"—

conflicts with *Bruen*'s "warning against 'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting *Bruen*, 597 U.S. at 26).

Those opinions restricting "the people" only to those who can vote ignore other Supreme Court cases that already expressly recognized that "the people" refers to individuals with no voting rights, such as resident aliens. *Verdugo-Urquidez*, 494 U.S. at 265. Mr. Coe is a member of the "national community" and one of "the people" as that "term of art" is used in the First, Second, and Fourth Amendments. *Id.*

> d.   <u>*Rahimi* rejected the government's contrary arguments</u>.

The government argued in the district court that "the people," as used in the Second Amendment, is limited to "law-abiding, responsible citizens." J.A. 52-29. The government's supposed "law-abiding, responsible citizens" limitation traces back to *Heller*, 554 U.S. at 635, where the Supreme Court wrote that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." The Court echoed this language in *Bruen*, repeatedly referring to the petitioners as "law-abiding, responsible citizens" (or variants thereof). 597 U.S. at 70; *see also*, *e.g.*, *id.* at 9, 26, 31. Based on these statements, the government argued in its response that *Heller* and *Bruen* defined the right to bear arms as being limited to "law-abiding, responsible citizens."

The government made the same argument in *Rahimi*, which involved a challenge to § 922(g)(8), prohibiting firearm possession by any person who is subject to a domestic violence restraining order. The government contended that "the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens." *United States v. Rahimi*, No. 22-915, Brief for United States 6; *see also id.* at 11, 12. In the Second Amendment context, the government argued, "responsible" is simply a synonym for "dangerous," since "a person is not 'responsible' if his possession of a firearm would pose a danger of harm to himself or others." *Id.* at 27. Accordingly, the United States asserted that § 922(g)(8) was constitutional because it accorded with America's tradition of disarming dangerous groups. *Id.* at 29.

The Supreme Court "reject[ed] the government's contention that Rahimi [could] be disarmed simply because he is not 'responsible.'" 144 S. Ct. at 1903. As the Court explained, "such a line" does not "derive from our case law." *Id.* Although *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those opinions "said nothing about the status of citizens who were not 'responsible,'" because that question was not at issue then. *Id.* In addition, the Court wrote, "'[r]esponsible' is a vague term" that cannot demarcate the bounds of the Second Amendment, since "[i]t is unclear what such a rule would entail." *Id.*; *see also id.* at 1945 (Thomas, J.,

33

dissenting on other grounds) ("[T]he Government's 'law-abiding, dangerous citizen' test—and indeed any similar, principle-based approach—would hollow out the Second Amendment of any substance. Congress could impose any firearm regulation so long as it targets 'unfit' persons. And, of course, Congress would also dictate what 'unfit' means and who qualifies.").

*Rahimi* thus dooms the government's attempt in this case to limit "the people" to "responsible" citizens. And what is true of "responsible" is equally true of "law-abiding," the second half of the government's proposed limitation. The Supreme Court in *Rahimi* did not specifically address the "law-abiding" portion of the government's argument because the government did not claim § 922(g)(8) was justified by Congress' power to disarm the non-"law-abiding." But both prongs of the government's proposed test—"responsible" and "law-abiding"—derive from the same source: *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. And just as the "responsible" question "was simply not presented" in *Heller* or *Bruen*, so too did those cases not address the "law-abiding" question. *Rahimi*, 144 S. Ct. at 1903.

The term "law-abiding," moreover, is just as "vague" as the term "responsible." *Id.* Neither provides a coherent, workable metric for deciding who is and is not among "the people." *See Range*, 69 F.4th at 102 ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague."); *Duarte*, 101 F.4th at

34

670, (same); *United States v. Coleman*, 698 F. Supp. 3d 851, 861 (E.D. Va. 2023) (similar).

In sum, the Second Amendment's reference to "the people" is not limited to "law-abiding, responsible citizens." Accordingly, the Second Amendment's "plain text covers [Mr. Coe's] conduct." *Bruen*, 597 U.S. at 17. And because 18 U.S.C. § 922(g)(1) regulates conduct the Second Amendment protects, § 922(g)(1)'s prohibition on felons possessing guns is presumptively unconstitutional under *Bruen*'s plain text standard at Step One. *See e.g.*, *Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring).

### 3. Section 922(g)(1) fails *Bruen*'s historical test.

To rebut the presumption of unconstitutionality, the government must demonstrate at Step Two that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 84. Crucially, the nature of that burden varies depending on what kind of problem a statute is designed to address—specifically, whether the problem is old or new. In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 26-27. The government must identify a robust tradition of "distinctly similar" founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, that is evidence

35

the statute is unconstitutional today. *Id.* So, too, if some jurisdictions in the founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both *Heller* and *Bruen* fell in this category: The laws challenged in those cases were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.*

A "more nuanced approach" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" or addressing a problem that was "unimaginable at the founding." *Bruen*, 597 U.S. at 27. For the latter regulations, courts ask whether the modern regulation is "relevantly similar" to a historical analogue. *Id*. at 28-29.

> a.    The societal problem addressed by § 922(g)(1) has existed since the founding.

Felons' access to firearms, which § 922(g)(1) prohibits, has posed a (potential) problem since well before 1791. Section 922(g)(1) is designed to address a general societal problem that has existed since the 18th century: the concern of allowing certain categories of individuals, convicted in the past of criminal conduct, to continue to arm themselves in self-defense. Because this is not an "unprecedented societal concern," or "dramatic technological change" the government must provide a "distinctly similar" historical regulation to show that § 922(g)(1) does not violate

the Second Amendment.  The government has not established such a historical tradition.

Even if this Court were to consider the lower "relevantly similar" standard as applicable to the historical review required by the *Bruen* Step Two, the government cannot provide regulations relevantly similar to § 922(g)(1).  The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [*i.e.*, the 'how'] and whether that burden is comparably justified [*i.e.*, the 'why']." *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry.").

This "how" and "why" must come from the same historical tradition of regulation to provide constitutional support to the challenged regulation, otherwise the government would be provided a "regulatory blank check" to infringe Second Amendment rights.  *Rahimi*, 144 S.Ct at 1944 (Thomas, J., dissenting).  *Rahimi* is an example of this analysis, considering a modern-day societal concern—domestic violence, and the regulations temporarily restricting access to firearms for domestic abusers, in reviewing the historical analogue.

In *Rahimi*, the "how" was a *temporary* restriction on Mr. Rahimi's Second Amendment right to arm himself in self-defense.  144 S. Ct. at 1902.  The "why" was because he had been specifically determined to be a "credible threat to the

physical safety of others." *Id.* at 1896. The *Rahimi* Court connected this "how and why" to a historical tradition of "regulations targeting individuals who physically threatened others …." *Id.* at 1899. The Court applied the "relevantly similar*"* standard to the challenged regulation. Its application of the "relevantly similar" standard aligns with the *Bruen* framework because, it found, protecting intimate partners from domestic violence is a modern-day societal issue.

*Rahimi*'s holding was narrow, in light of the facial challenge brought in that case. 144 S. Ct. at 1903 ("In *Heller*, *McDonald*, and *Bruen*, this Court did not 'undertake an exhaustive historical analysis … of the full scope of the Second Amendment.' Nor do we do so today. Rather, we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment") (internal citation omitted). *Rahimi*'s reliance on and analysis of the historical surety laws and "going armed laws," however, only highlight the lack of historical support for a more permanent, broader ban of Second Amendment rights to a large category of people such as Mr. Coe.

Importantly, the "how" in § 922(g)(1) is a permanent infringement on a person's Second Amendment right to arm themselves in self-defense. The "why" is a perceived concern with a class of citizens, based on criminal history and status, and not based on a specific finding of dangerousness to others. *Rahimi*, 144 S. Ct.

at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *id.* at 1926 (Barrett, J., concurring) ("To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right.").  This broad prohibition of a class of people's Second Amendment right to carry arms for self-defense is a far cry from the specific regulation upheld in *Rahimi* or discussed in *Bruen*.  *Cf. Rahimi*, 144 S. Ct. at 1938, n.5 (Thomas, J., dissenting) (citing *Bruen*, 597 U.S. at 70 (noting that regulations "limit[ing] the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could carry arms" do not justify "broadly prohibit[ing] the public carry of commonly used firearms for personal defense.")).

Because the principle societal concern underlying § 922(g)(1) is not a uniquely modern one, at *Bruen* Step Two the government must propose a "distinctly similar" regulation that either substantially abridged felons' right to keep and bear arms, or permanently denied firearms to some group akin to felons.  No such laws from the founding era exist.  *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous",* 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at

the founding); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup v. Att'y General*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y General*, 980 F.3d 897, 914-15 (3d Cir. 2020) (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons"); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) ("[S]cholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms …."). And the government has yet to identify a single historical regulation, let alone a robust history and tradition, that broadly prohibited the ability to arm oneself to such categories of people.

The first felon-in-possession laws similar to § 922(g)(1) did not appear until the 20th century. Today's § 922(g)(1) traces its origins only to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from "receiving" firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm "receipt" by those convicted of specific felonies such as murder, rape, and kidnapping. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended that statute to prohibit "receipt" "by all felons." *Skoien*, 614 F.3d at 640. And it was not until 1968 that Congress formally "changed

the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus, the first firearm regulation in America broadly prohibiting all felons from possessing firearms was not enacted until almost two centuries after our Nation's founding. *See Kanter*, 919 F.3d at 464 n.12 (Barrett, J., dissenting) ("[T]he first general prohibition on felon gun possession was not enacted until 1961 ….").

Section 922(g)(1) thus is the first law in our Nation's history to broadly prohibit all felons from possessing a firearm. There was nothing before the 20th century, even in individual colonies or states. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) (observing that "state laws prohibiting felons from possessing firearms or denying firearm licenses to felons date from the early part of the twentieth century"). As *Bruen* makes clear, such "belated innovations … come too late to provide insight into the meaning of the Constitution in [1791]." *Bruen*, 597 U.S. at 36-37; *see also id.* at 66 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their amici").

In sum, there was no "historical tradition," circa 1791, of firearm regulations "distinctly similar" to § 922(g)(1). The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms. *Bruen*, 597 U.S. at 27. They declined to do

41

so, and that inaction shows that § 922(g)(1), like the firearm regulation in *Heller*, "[i]s unconstitutional." *Id.*

Indeed, history indicates that the opposite of § 922(g)(1) was enshrined in the Second Amendment. As noted by the *Heller* Court, and Justice Thomas dissenting in *Rahimi*, "[T]he Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents in part by disarming their opponents." *Heller*, 554 U.S. at 592; *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting). As a result, the founders were extremely protective of individual liberty and the right to bear arms. And as Justice Thomas further notes in his dissent, "laws targeting 'dangerous' persons led to the Second Amendment. It would be passing strange to permit the Government to resurrect those self-same 'dangerous' person laws to chip away at that Amendment's guarantee." *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting).

b.    *Rahimi* confirms this historical analysis.

*Rahimi* also confirms that § 922(g)(1) does not fit within "this Nation's historical tradition of firearm regulation." *Id.*

First, the government argued below that § 922(g)(1) is consistent with a tradition of disarming "dangerous" citizens. J.A. 51. *Rahimi* forecloses this argument for the same reason it forecloses the government's "law-abiding, responsible citizens" argument. *Rahimi*, 144 S. Ct. at 1903.

Additionally, terms like "unvirtuous" and "dangerous" are just as "vague" as "responsible." *Rahimi*, 144 S. Ct. at 1903. Those terms are therefore too nebulous to define a historical tradition that courts must invoke to determine who does and does not enjoy Second Amendment rights. Whether a particular person's felony record renders him unvirtuous or dangerous is anyone's guess. As in *Rahimi*, it is "unclear what such a rule would entail." *Id.*

Concurring in *Rahimi*, Justice Barrett warned that courts "must be careful not to read a principle at such a high level of generality that it waters down the right." 144 S. Ct. at 1926 (Barrett, J., concurring). Justice Gorsuch also noted that courts should not "try[] to glean from historic exceptions overarching 'policies,' 'purposes,' or 'values' to guide them in future cases." *Id.* at 1908 (Gorsuch, J., concurring) (citation omitted). Nor should courts "extrapolate from the Constitution's text and history 'the values behind that right, and then … enforce its guarantees only to the extent they serve (in the courts' views) those underlying values.'" *Id.* (citation omitted). Rather, courts "must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Id.*; *see also id.* at 1933-35 (Thomas, J., dissenting) (noting that "[t]he Second Amendment stems from English resistance *against* 'dangerous' person laws.") (emphasis in original).

43

Adopting an "unvirtuous" or "dangerous" principle would conflict with these insights.  *See Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous … to delineate the scope of the Second Amendment"); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

In sum, nothing in *Rahimi* demonstrates that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.  In fact, *Rahimi*'s rejection of the government's arguments dictates that this Court should reject them here.

> 4.     <u>*Rahimi* abrogates this Court's decision in *Canada*</u>.

This Court held in *United States v. Canada* that because there is "some set of circumstances" where § 922(g)(1) may be constitutionally applied, a facial challenge fails.  103 F.4th 257 (4th Cir. 2024).  *Canada* was decided before the Supreme Court's clarified the *Bruen* standard in *Rahimi*.  In *Canada*, this Court noted it would not need to choose an "analytical path" to considering the facial constitutional challenge to § 922(g)(1) and broadly asserted that a set of circumstances existed in which § 922(g)(1) would be constitutional.  *Id.*  The *Canada* Court observed that "[t]he law of the Second Amendment is in flux, and courts (including this one) are grappling with many difficult questions in the wake" of *Bruen*.  *Id.*

As set forth above, *Rahimi*'s clarification of the "text and history" test established in *Bruen* should prompt this Court to reconsider a facial challenge to § 922(g)(1). Reconsideration would accord with the Supreme Court's actions, after *Rahimi*, in granting several cert. petitions raising *Bruen* challenges, vacating the appellate court judgments, and remanding the cases back to those courts in light of *Rahimi*. Importantly, one of those petitions was from the decision in *United States v. Doss*, No. 22-3662, 2023 WL 8299064 (8th Cir. 2023), *vacated and remanded* ___ S. Ct. ___, 2024 WL 3259684 (July 2, 2024), and included both a facial and as-applied challenge to § 922(g)(1). The Supreme Court thus deems *Rahimi* significant enough to have lower courts review their judgments for both facial and as-applied challenges to firearm regulations. By the same token, this Court should reconsider its holding in *Canada*.

In *Canada*, this Court identified four possible bases on which § 922(g)(1)'s facial constitutionality might be sustained: (1) at *Bruen* Step One, "the people" in the Second Amendment's plain text refers to some (unspecified) subset of Americans that excludes felons; (2) at *Bruen* Step Two, there exists a "tradition of disarming dangerous people"; (3) in *Bruen* and *Heller*, the Supreme Court referred, respectively, to "'law-abiding citizens' and 'longstanding prohibitions on the possession of firearms by felons'"; and (4) *Bruen* did not abrogate post-*Heller* Fourth Circuit cases holding that § 922(g)(1) is constitutional. *Canada*, 103 F.4th

45

at 258.  But the *Canada* panel expressly declined to say whether any of these theories was correct, writing that it "need not—and thus d[id] not—resolve" those questions. *Id.*  Instead, the Court concluded that "[n]o matter which analytical path" it chose, § 922(g)(1) could constitutionally be applied to defendants convicted of certain crimes—"a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States."  *Id.*

As explained above, it is clear following *Rahimi* that "the people" in the Second Amendment means "all Americans," *Bruen*, 597 U.S. at 70, not just "law-abiding, responsible citizens."  At least one of the possible theories identified in *Canada* (theory (1)) is therefore incapable of justifying § 922(g)(1).  And because the Fourth Circuit expressly refused to endorse any of *Canada*'s remaining theories, that decision no longer establishes § 922(g)(1)'s facial constitutionality.  Effectively, *Canada*'s theory (1) holding is overruled by *Rahimi*, and the other three are dicta.

Moreover, *Rahimi* undermines all of *Canada*'s other theories.  *Rahimi*'s rejection of the government's "responsible" argument entails a rejection of the supposed "dangerous" category as well; the government argued the two categories were the same.  *See supra*.  In addition, as noted above, terms like "dangerous" are just as "vague" as the term "responsible," which *Rahimi* deemed too indeterminate to define a historical tradition.  144 S. Ct. at 903.  *Canada* theory (2) is therefore invalid.

As for theory (3), *Rahimi* faulted the government for arguing that the Supreme Court's prior cases had already held legislatures may disarm "irresponsible" people. That question, the Court explained in *Rahimi*, "was simply not presented" in *Heller* or *Bruen*. *Id.* In other words, *Rahimi* teaches that lower courts should not carve out exceptions to the Second Amendment by relying on passing statements in previous Supreme Court opinions regarding questions that were not at issue in those cases. The question of "prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, was "simply not presented" in *Heller*, and so under *Rahimi*, *Heller*'s dictum on that topic cannot justify excluding felons from the right to keep and bear arms, *Rahimi*, 144 S. Ct. at 1903.

Finally, the Fourth Circuit's "post-*Heller* but pre-*Bruen* holdings rejecting constitutional challenges to [§ 922(g)(1)]," *Canada*, 103 F.4th at 258, were based entirely on *Heller*'s statement that felon-disarmament laws were "presumptively lawful." *See* J.A. 65-67 (citing and discussing *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012)). If *Rahimi* abrogated reliance on *Heller*'s dictum, then it necessarily also abrogated reliance on the Fourth Circuit's pre-*Bruen* cases upholding § 922(g)(1). Accordingly, *Canada* theory (4) does not survive *Rahimi*.

To the extent the Court believes *Canada* remains good law, Mr. Coe asserts—for purposes of possible further review by the Supreme Court or the en banc Fourth Circuit—that the case was wrongly decided for the reasons just argued.

5.    <u>Section 922(g)(1) is unconstitutional as applied to Mr. Coe</u>.

Even if the Court adheres to *Canada*'s holding that § 922(g)(1) is not facially unconstitutional, that does not preclude an as-applied challenge to the statute. *Canada* was a "narrow" opinion, holding only that § 922(g)(1) is constitutional on its face. 103 F.4th at 258. The Court assumed the statute may violate the Second Amendment as applied to individual defendants. *Id.* In light of that recognition, this Court should hold that § 922(g)(1) is unconstitutional in Mr. Coe's case.

In the district court, the government did not identify any historical tradition or analogues that would justify permanently disarming someone with the kinds of felony convictions on Mr. Coe's record: simple possession of drugs, and simple possession (never use) of firearms. J.A. 222-228. The government made only a passing mention of these convictions in its district court briefing, asserting broadly that they "involve inherently dangerous conduct." J.A. 50.

One test that provides a workable, predictable test that avoids vagueness problems is the categorical approach—that is, looking to the elements of the prior conviction to determine if the offense necessarily involved the use, attempted use, or threatened use of force. That is the one way to be certain what offense the defendant was necessarily convicted of committing. Further, such a test would be consistent with *Rahimi* and *Canada*.

*Rahimi* held that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 144 S. Ct. at 1896. *Canada* provided illustrative examples of situations where § 922(g)(1) could be applied consistent with the Second Amendment, namely, against "people who have been convicted of drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President." Disarming people with those convictions, it held, would be consistent with "the history of disarming those who threaten public safety." 103 F.4th at 258.

The way courts decide what kinds of convictions inherently "threaten public safety" is to apply the categorical approach. As this Court noted more than three decades ago, "[w]hen the Supreme Court faced a choice between the particularized and the categorical approaches to the determination of violent crimes, it made plain its preference for the latter." *United States v. Wilson*, 951 F.2d 586, 589 (4th Cir. 1991). The categorical approach "economizes on judicial resources" and avoids "mini-trials" long after the fact which would be "costly, but unreliable." *Id.* In addition, "the categorical approach further the important values of comity and federalism" by avoiding the possibility of conflicting factual determinations between state juries and federal courts. *Id.* at 590. And as the Supreme Court has repeatedly held, looking to the elements of the offense is the only reliable way to determine what facts a jury must have found in order to support a conviction. *See Descamps*

*v. United States*, 570 U.S. 254, 267 (2013); *Mathis v. United States*, 579 U.S. 500, 515 (2016) (in determining what a prior jury or judge found in convicting a defendant, "elements alone fit that bill").

To be sure, using the categorical approach in this context does present the problem that it is necessarily backward-looking. *Rahimi* upheld § 922(g)(8) because that restriction, like surety laws, focused on the danger someone posed at the present moment, or in the future, not whether the person had done something dangerous at some distant point in the past.  A person's prior conviction may only be a weak proxy for how dangerous they would be going forward.  The categorical approach, then, may not be the only or the best method for as-applied Second Amendment challenges.  But it is at least *a* method, which is more than the government has offered so far, aside from its own *ipse dixit*.

If the Court adopts the categorical approach, its application to Mr. Coe's case is straightforward.  First, Mr. Coe was born and raised in Richmond, Virginia (J.A. 215; J.A. 230-231) and thus is a lifelong citizen of the United States.

Second, his prior convictions are for simple possession of drugs, and simple possession (never use) of firearms, including:

* 2015 possession of drugs and a firearm (suspended time and 2 years VADOC on a concealed weapon charge);

* 2017 possession of a firearm with controlled substance (1 year of active time); and

    \*   2020 simple possession of controlled substance and possession of firearm by felon (3 years of active time).

*See* J.A. 222-228.  That is to say, none of his prior convictions involve the use or attempted use of violence or threats.  And the founding era, as discussed above, had no analogue to drug statutes, let alone restrictions on gun ownership for those who possessed substances as a class.

In sum, Mr. Coe is one of "the people" that the Second Amendment demands must be allowed to bear arms and carry necessary ammunition to make a gun operable.  *See, e.g.*, *Range*, 69 F.4th at 104-05 (rejecting government's argument that "'legislatures traditionally used status-based restrictions' to disarm certain groups of people," and finding that "[a]part from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances").  The Second Amendment presumptively protects Mr. Coe's conduct in possessing a gun and ammunition in this case.  Because the government cannot show that § 922(g)(1) as applied to Mr. Coe is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, Mr. Coe's conviction under 18 U.S.C. § 922(g)(1) violates the Second Amendment.

## <u>CONCLUSION</u>

Because the district court wrongly denied Mr. Coe's motion to suppress the evidence resulting from his unlaw seizure and the following search, this Court reverse the district and vacate Mr. Coe's conviction.  In the alternative, because the district court wrongly denied Mr. Coe's motion to dismiss the indictment as violative of his Second Amendment right to possess firearms, this Court should reverse the district court, vacate Mr. Coe's conviction, and remand with instructions to dismiss the indictment.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

   s/  Frances H. Pratt
_____
Frances H. Pratt
Joseph S. Camden
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Fran_Pratt@fd.org
Joseph_Camden@fd.org

Dated July 29, 2024

## **REQUEST FOR ORAL ARGUMENT**

Counsel for Mr. Perez assert that the issues raised in this brief may be more fully developed through oral argument, and respectfully request the same.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief has been prepared using Microsoft Word for Office 365 software, Times New Roman font, 14-point proportional type size.

2.      EXCLUSIVE of the table of contents, table of authorities, signature block, statement with respect to oral argument, and this certificate of compliance, this brief contains no more than 13,000 words, specifically 12,146 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


      July 29, 2024                        s/   Frances H. Pratt       
            Date                            Frances H. Pratt
                                        Assistant Federal Public Defender